UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AMBER BRIDGES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-04706-DML-WCG |
| | ) | |
| CITY OF INDIANAPOLIS, | ) | |
| | ) | |
| Defendant. | ) | |

## Order on Defendant's Motion for Summary Judgment

### Introduction

Plaintiff Amber Bridges worked in various capacities for the Marion Superior Court from December 2010 through May 11, 2017, when her employment was terminated. Her termination occurred after her superiors conducted an inquiry of various employees that was prompted by a complaint Ms. Bridges had brought to their attention—that another employee was the source of an odor within the office environs. Ms. Bridges asserts in this lawsuit that (a) her employer regarded the other employee as disabled and terminated Ms. Bridges's employment because of her "association" with that employee and (b) her termination therefore violated the "association" discrimination provision of the Americans with Disabilities as Amended ("ADAAA").

Defendant City of Indianapolis[1] has moved for summary judgment. For the reasons addressed below, the City's motion is GRANTED.

## Summary Judgment Standard

Summary judgment is appropriate when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The court views the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip,* 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

A "material fact" is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. The party moving for summary judgment bears the initial burden to inform the district court of the basis for its motion and the evidence it believes demonstrates the absence of a genuine dispute of material fact. *Celotex,* 477 U.S. at 323. The nonmovant may not rest on her pleading but must "make a sufficient showing on [each] essential element of her case with respect to which she bears the burden of proof," *id.* at 323, by designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324. Disputes about irrelevant facts do not matter; only factual disputes that might

---

[1] The City's summary judgment brief states that Ms. Bridges's formal employer was the Marion Superior Court and not the City itself.

affect the outcome of the suit in light of the substantive law will prevent summary judgment. *Liberty Lobby,* 477 U.S. at 248.

## Statement of Facts

The designated admissible evidence, with all reasonable inferences drawn and evidentiary conflicts resolved in Ms. Bridges's favor, reveals the following.

Ms. Bridges was hired in December 2010 by the Marion Superior Court to work at the Arrestee Processing Center ("APC"). She generally worked the night shift, and her job included obtaining information from arrestees to assist in the development of a bonding recommendation, court reporting, updating case files in the court's database system, and preparing files for the court. (Bridges Dep. Trans., Dkt. 42-2, p. 4, lines 17-20, p. 5, lines 15-23, p. 6, lines 6-9). In early March 2016, Ms. Bridges was promoted as the new "Staff Lead" for the APC. Although Staff Lead was a non-management position and Ms. Bridges continued to perform her usual duties, the job as Staff Lead included leadership responsibilities, such as training new employees, helping to promote office efficiencies, working closely with the APC Director, and filling in for employees (whether day, night, or weekend shifts) who were absent from work because of sickness or vacation.

As of this period, Ms. Bridges was considered an exceptional employee. She received very high marks in her June 2016 annual performance evaluation of her work as a bailiff and then Staff Lead for the APC in the preceding year and was assessed at the highest Outstanding level of 10, on a 1 to 10 scale, in nearly all performance categories. Her high level of job competence, dependability, and

willingness to help while an APC bailiff were emphasized, and it was noted that the APC Staff Lead position was a natural progression for her because of her exceptional knowledge and skills as an APC bailiff. Her lowest score—a 7 out of 10—was in the area of "judgment." The evaluator explained that Ms. Bridges could improve on "setting better boundaries" with other APC bailiffs, should not "micromanage," and should make better judgment calls in her new leadership role. (Dkt. 42-6 at pp. 2-5).

In late July 2016, at the request of a supervisor for the Magistrate Court (a court that provided judicial functions in connection with arrestees within the Arrestee Processing Center), Ms. Bridges began also assisting from time to time with that court's operations. (*See* July 26, 2016 email, Dkt. 42-7 at p. 2). When the APC group was fully-staffed for a particular shift—and Ms. Bridges therefore did not need to fill in for an absent employee—Ms. Bridges would move to the Magistrate Court staff's area and assist its functions. The Magistrate Court staff worked a day shift, and Ms. Bridges began working in that staff's office about once or twice per week until January 2017. In January 2017, Ms. Bridges was named the "Lead" for the Magistrate Court staff, in addition to continuing her duties as Staff Lead for the APC staff. Although not completely clear from the record, when Ms. Bridges was named Lead for the Magistrate Court staff in January 2017, her base of operations moved to the Magistrate Court staff's room.

An employee named Ms. McRoy—the person about whom Ms. Bridges brought complaints to the attention of her superiors—began working for the

Magistrate Court on September 6, 2016.  The Magistrate Court staff (generally five people) had their work desks in one office space that they shared with two clerks for the court.  Their five desks were in two rows.  Ms. Bridges's desk was in the row of three and she sat in the middle desk in front of Ms. McRoy's desk.

Ms. Bridges thought there was a foul odor in the Magistrate Court's staff's work room that she noticed every time she worked in that office.  She did not know where the odor was coming from, but one of the employees kept air freshener in her desk and "it would be like, 'What's that smell?' and then the spray would come out just to clear it up." (Bridges Dep., p. 28, lines 23-25).  Some time in late 2016—maybe November or December—Ms. Bridges reached the conclusion that Ms. McRoy was the source of the smell because she perceived that the office did not smell if Ms. McRoy was not there and the smell was more pronounced when Ms. McRoy came to Ms. Bridges's desk or reached over it.  (*Id.*, p. 32, lines 18-23).

Eventually, Ms. Bridges decided to report the issue to her superior, Angela Biddle, who supervised the Magistrate Court staff. The record is inconsistent about when this happened. Ms. Bridges testified in her deposition that she reported the issue to Ms. Biddle in December 2016, but Angela Biddle testified by affidavit that this occurred in April or early May 2017.  Ultimately, the date is not material.  The record is consistent that—whenever it happened—Ms. Bridges made an appointment with Ms. Biddle and told her that there was an unbearable odor, the staff had all complained about it, and there was a consensus that Ms. McRoy was the source.  Ms. Biddle told Ms. Bridges that she needed to ask her superior (Paige

5

Bova Kervan, the Chief Operations Officer for the Marion Superior Court) how to handle the situation. Ms. Biddle then reported back to Ms. Bridges after discussing it with Ms. Bova Kervan "that there was nothing that we could really do about it because it could be a health issue, and that could come off as discrimination and it was something that they couldn't have from the court." (Bridges Dep., p. 46, line 20 to p. 47 line 1).

Ms. Bridges addressed the odor issue by bringing a scent-warmer to the office—a device that heats scented wax and fills the air with that scent. (*Id.,* p 47, lines 10-24). She put it on her desk, took votes about which scents she should buy, and she and others in the office (but not Ms. McRoy) would bring in scents and add a new wax scent each day. (*Id.,* p. 49, line 19 to p. 50, line 7).

Ms. Biddle did not do nothing about Ms. Bridges's odor complaint, however. At the direction of the Chief Operations Officer (Ms. Bova Kervan), Ms. Biddle conducted an investigation and reported back to Ms. Bova Kervan. (Biddle Aff., Dkt. 37-2, ¶¶ 7-18; Bova Kervan Aff., ¶¶ 5-11). Ms. Biddle interviewed various employees and then met with Ms. McRoy. She reported to Ms. Bova Kervan that two of the Magistrate Court staff employees who shared the same office with Ms. Bridges and Ms. McRoy said that there was an odor at times in the office, but it wasn't significant.[2] Ms. Biddle visited Ms. McRoy at her desk on two occasions but

---

[2] Ms. Bridges misstates the record about Ms. Biddle's inquiry of these two staff employees. She says that Ms. Biddle asked the staff members about "McRoy and her odor directly and specifically," but there's no evidence of that. The affidavit testimony recites that Ms. Biddle was told by the staff members that there was an

did not notice an odor coming from her. Ms. Biddle then sat with Ms. McRoy during a court session and did not notice an odor coming from her. (Biddle Aff., ¶¶ 8-9). Ms. Bova Kervan also had an in-person conversation with Ms. McRoy, and she too did not notice an odor coming from Ms. McRoy. (Bova Kervan Aff., ¶10). Both Ms. Bova Kervan and Ms. Biddle concluded that there was no odor from Ms. McRoy and decided that issue did not need to be further pursued. (Biddle Aff., ¶ 11; Bova Kervan Aff., ¶ 11).

During Ms. Biddle's investigative interviews with employees, she was given information about Ms. Bridges's conduct. Two employees within the Magistrate Court staff, including Ms. McRoy, reported that they felt harassed or intimated by Ms. Bridges because Ms. Bridges would call attention to any errors they made, roll her eyes, and make "indirect" comments about them to other employees. (Biddle, Aff., ¶ 17; McRoy Aff., ¶ 11; May 10, 2017 email, Dkt. 42-13). Employees told Ms. Biddle that when Ms. McRoy would enter the Magistrate Court staff office space, Ms. Bridges would announce that she needed to turn on the air freshener. (Biddle Aff., ¶ 15).

Staff members within the APC, for which Ms. Bridges was also "Team Lead," complained that Ms. Bridges had not been providing proper training (one of her job responsibilities) and because they were too intimidated to ask questions of her, they looked to each other for answers instead of asking Ms. Bridges. (Biddle Aff., ¶ 18;

---

odor in the office but it was "nothing significant." There is no testimony that Ms. Biddle asked these employees about Ms. McRoy "directly" or "specifically."

Bova Kervan Aff., ¶ 18)). Ms. Biddle and Ms. Bridges also spoke with a person who worked as a Victim Advocate ("VA") staff member. The VA employee reported that she had had a heated dispute with Ms. McRoy and that while Ms. Bridges—who was Team Lead—engaged in private text communications with the VA staff member about the situation, she had never alerted any management personnel about the matter. (*Id.,* ¶ 16; Bova Kervan Aff., ¶17).

After receiving the above information about Ms. Bridges's work conduct, Ms. Bova Kervan decided to terminate Ms. Bridges's employment on May 11, 2017. (Bova Kervan Aff., ¶ 19). Ms. Bova Kervan and Ms. Biddle met with Ms. Bridges on that date, presented her with a "Corrective Action Record" that outlined the reasons for her termination, and described those reasons to Ms. Bridges. (Bova Kervan Aff., ¶ 20-21 and Dkt. 37-4 at pp. 5-6). The Corrective Action Record recounts the above-described conduct and the conclusion that the behavior was unprofessional and unacceptable for an employee, and particularly one in a leadership role. (*See* Dkt. 37-4). Ms. Bridges refused to sign the document. Within a week of her termination, Ms. Bridges asked for a letter of recommendation (May 17, 2017 email, Dkt. 42-14), but there is no record evidence that one was provided or if so, its contents.[3]

Ms. McRoy continued to work as a bailiff for the Magistrate Court until July 8, 2017, when she took a different job with the City of Indianapolis that lasted until

---

[3] Ms. Bridges misstates the contents of this May 17, 2017 email. She describes the email as Ms. Bova Kervan's "offer to provide" a recommendation letter. The email—written by Ms. Biddle to Ms. Bova Kervan—states that Ms. Bridges "would like for [Ms. Bova Kervan] to give her a recommendation letter like we discussed yesterday."

8

September 2018, when she left City employment to work in the private sector. (McRoy Aff., ¶¶ 1-3, Dkt. 37-1). Ms. McRoy never had a physical or mental impairment that substantially limited her personal life or ability to do her job and never considered herself to be disabled. (*Id.*, ¶ 4). She never suffered from a body odor problem. (*Id.*, ¶ 9). She never asked for any work accommodation related to any disability and she did not feel she was treated by her supervisors as if she had a disability. (*Id.*, ¶¶ 4, 9-10). Her personnel records contain no indication that she suffered from a disability. (Bova Kervan Aff., ¶ 13).

During Ms. McRoy's and Ms. Bridges's overlap in employment, they were not social friends. While they sometimes went together to a nearby market to grab food for lunch and sometimes engaged in small-talk, Ms. Bridges agrees that Ms. McRoy did not discuss any personal, or even work, issues with her. (Bridges Dep., p. 34, lines 20-23). Ms. McRoy was not part of an office GroupChat that had been started when some employees, including Ms. Bridges, were organizing an after-work get-together and which was used to text about Ms. McRoy's alleged odor problem. (Bridges Dep., p. 44). Though Ms. Bridges often tried to get her work colleagues to socialize together after work, Ms. McRoy never joined in, which displeased Ms. Bridges. (McRoy Aff., ¶ 6). Ms. McRoy believed Ms. Bridges did not like her, and she found Ms. Bridges difficult to work with. (McRoy Aff., ¶ 5).

Neither Ms. Biddle (Ms. Bridges's and Ms. McRoy's supervisor) nor Ms. Bova Kervan (the Chief Operations Officer), who were involved in the decision-making process to terminate Ms. Bridges's employment, knew of any relationship between

Ms. Bridges and Ms. McRoy other than that they both worked for the court.  (Biddle Aff., 14; Bova Kervan Aff., ¶ 15).

## Analysis

### I. The ADAAA prohibits associational discrimination.

As noted at the outset, Ms. Bridges contends that her firing violated the "associational" discrimination provision of the Americans with Disabilities Act, as amended.  Under the Act, a "covered entity" (the defendant does not contest it is a covered entity) cannot "discriminate against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees. . . ."  42 U.S.C. § 12112(a).  The "associational" provision is contained in Section 12112(b)(4) and provides that the phrase "discriminate against a qualified individual on the basis of disability" includes "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."  Thus, as provided by the EEOC's regulations, an employer may not "exclude or deny equal jobs or benefits, or otherwise discriminate against, a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a family, business, social or other relationship or association."  29 C.F.R. § 1630.8.

This associational discrimination provision has been rarely litigated (the Seventh Circuit appears to have addressed claims under this provision only three

times[4]), but its purpose is to protect employees from adverse employment actions that are based on unfounded assumptions about the needs of a disabled person. *Magnus v. St. Mark United Methodist Church,* 688 F.3d 331, 336-37 (7th Cir. 2012). As the Seventh Circuit has explained (and other circuit courts of appeal concur), "[t]hree types of situations" are "within the intended scope" of the associational discrimination provision. *Larimer v. IBM Corp.,* 370 F.3d 698, 700 (7th Cir. 2004). Each type is indicative of an employer's bias or prejudice against the needs of disabled persons which leads to an employment punishment against a non-disabled employee who has a close association with the disabled person. The Seventh Circuit has described the three situations within the associational provision as follows:

> We'll call [the three situations] "expense," "disability by association," and "distraction." They can be illustrated as follows: an employee is fired (or suffers some other adverse personnel action) because
> (1) ("expense") his spouse has a disability that is costly to the employer because the spouse is covered by the company's health plan;
> (2a) ("disability by association") the employee's homosexual companion is infected with HIV and the employer fears that the employee may also have become infected, through sexual contact with the companion;
> (2b) (another example of disability by association) one of the employee's blood relatives has a disabling ailment that has a genetic component and the employee is likely to develop the disability as well (maybe the relative is an identical twin);
> (3) ("distraction") the employee is somewhat inattentive at work because his spouse or child has a disability that requires his attention, yet not so inattentive that to perform to his employer's satisfaction he would need an accommodation, perhaps by being allowed to work shorter hours. The qualification concerning the need for an accommodation (that is, special consideration) is critical because the right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate of a disabled person.

---

[4] *See Larimer v. IBM Corp.,* 370 F.3d 698 (7th Cir. 2004) (its first case, according to the court); *Dewitt v. Proctor Hosp.,* 517 F.3d 944 (7th Cir. 2008), and *Magnus v. St. Mark United Methodist Church,* 688 F.3d 331 (7th Cir. 2012).

11

*Larimer,* 370 F.3d at 700.

Thus, under a *McDonnell Douglas* framework, there must be evidence (or reasonable inferences therefrom) that Ms. Bridges (1) was qualified to do her job; (2) was subjected to an adverse employment action; (3) was known by the defendant employer at the time to have a relative or associate with a disability; and (4) "her case falls into one of the three relevant categories of expense, distraction, or association." *Magnus,* 688 F.3d at 336-37. Further, as the three categories themselves indicate and anti-discrimination law requires, there must be some evidence of causation—a showing that "it is more likely than not the employer took the adverse action because" of the disability of the person with whom the employee had a relationship or association. *Id.* at 337.

The City/Marion Superior Court accepts for purposes of summary judgment that Ms. Bridges was qualified to do her job and was subjected to an adverse employment action—she was fired. It contests, however, that (a) Ms. McRoy had a disability, (b) Ms. Bridges had the requisite association with Ms. McRoy, and (c) any of the relevant categories of associational discrimination exists under the facts. The court addresses these matters in turn below.

## II. There is insufficient evidence on which a jury could decide that Ms. McRoy was disabled.

As the statute provides, the ADAAA's prohibition against discrimination because of an employee's association with a disabled person requires the employer to know of the disability. Ms. Bridges concedes that there is no evidence that Ms.

12

McRoy was disabled or had a record of being disabled. She posits, however, that the City/Superior Court "regarded" Ms. McRoy as being disabled, and that's good enough. As provided by the EEOC's regulations, a person is disabled within the meaning of the statute if she is "regarded as" having a physical or mental impairment, meaning that the employer perceived the person to suffer from a physical or mental impairment that is not both "transitory" and "minor." 29 C.F.R. § 1630.2(g)(iii). While "minor" is not defined by the regulations, a "transitory" impairment is one that lasts or is expected to last six months or less. 29 C.F.R. § 1630.2(f). It is not necessary to show that the employer believed that the impairment substantially limited one or more of the person's major life activities. 29 C.F.R. § 1630.2(j)(2).

The entire basis for Ms. Bridges's contention that the defendant regarded Ms. McRoy as disabled is her own deposition testimony about what Ms. Angela Biddle told her after she first spoke with Ms. Paige Bova Kervan about how to handle Ms. Bridges's complaint that Ms. McRoy exuded an odor. Ms. Bridges testified:

> Angie [Biddle] told me that after her conversation with Paige [Bova Kervan] that there was nothing that we could really do about it because it could be a health issue, and that could come off as discrimination, and it was something that they couldn't have from the court. So it was kind of just left alone.

(Bridges Dep. at p. 46, line 22 to p. 47, line 2). That Ms. Bridges was told an "unbearable" odor from an employee about which she complained (and asserted was a common complaint among the Magistrate Court staff) should be left alone because

13

there could be a health issue is not enough evidence to permit a reasonable jury to conclude that Ms. McRoy was regarded by her employer as disabled.

The undisputed evidence shows that the employer—through Ms. Biddle and Ms. Bova Kervan—then investigated Ms. Bridges's odor complaint. The employer had not previously perceived that Ms. McRoy had any odor or that she suffered from any medical impairment—minor, major, transitory, or otherwise—that caused an odor. Instead, for the purpose of deciding how Ms. Bridges's concern (and that of other co-workers, according to Ms. Bridges) might be addressed, Ms. Biddle and Ms. Bova personally met with Ms. McRoy on separate occasions, and neither one of them detected an odor coming from Ms. McRoy.[5] There is no evidence contradicting their affidavit testimony that after these in-person encounters with Ms. McRoy, Ms. Biddle and Ms. Bova Kervan concluded that there simply was no odor coming from Ms. McRoy.

Summary judgment in favor of the defendant is therefore appropriate because, on this record, no reasonable jury could decide that the City/Superior Court regarded Ms. McRoy as disabled when the decision was made to terminate Ms. Bridges's employment. In addition, as discussed below, summary judgment is

---

[5]   Ms. Bridges makes a lengthy argument that Ms. Biddle's and Ms. Bova Kervan's meetings with Ms. McRoy to determine whether there was an odor violated a regulation prohibiting employers from conducting medical examinations or inquiring whether an employee is disabled unless the examination or inquiry is justified by job duties or business necessity. *See* Dkt. 41 at pp. 12-15. To the extent this regulation has any connection to this case, there is no evidence of any medical examination or an inquiry to Ms. McRoy or anyone else whether Ms. McRoy suffers from any medical impairment. Rather, Ms. Biddle and Ms. Bova Kervan sought to determine whether Ms. McRoy had any odor issue at all.

warranted on another, independent ground—the lack of evidence that Ms. Bridges had an "association" with Ms. McRoy as contemplated by the ADAAA.

### III. No reasonable jury could find that Ms. Bridges had an "association" with Ms. McRoy.

Ms. Bridges's "association" with Ms. McRoy was as a co-worker *only*—and not a close one at that. They are not related. They were not friends. They did not socialize outside the work environment. Ms. McRoy declined to attend any after-work staff get-togethers that Ms. Bridges championed. Ms. McRoy was not a member of the office staff GroupChat. Their level of any socialization was very limited. According to Ms. Bridges herself, she and Ms. McRoy walked to grab lunch at a local market a few times only during the approximate eight months that Ms. McRoy worked in the Magistrate Court office with Ms. Bridges. Ms. McRoy engaged in basic "small talk" with Ms. Bridges, but they didn't discuss personal, or even work, issues. Ms. McRoy believed that Ms. Bridges did not like her. And there is no evidence to contradict the affidavits of Ms. Biddle and Ms. Bova Kervan that they knew of no association or relationship between Ms. Bridges and Ms. McRoy other than that they both worked for the court.

Ms. Bridges has not cited a single authority that would permit a conclusion that this kind of superficial connection to a co-worker is an "association with a disabled person" protected under the ADAAA's anti-disability discrimination provisions. All of the cases cited by the parties concern either familial relationships or associations characterized by a level of protective, caring bond between the

employee and the disabled person.[6] That is not surprising given that the very purpose of the associational discrimination rubric is to guard against disability discrimination against an employee, not because of the employee's own disability, but because of the employee's close connection with someone else that the employer knows to be disabled. Indeed, in this case where the alleged disabled "associate" is herself an employee, if the employer really harbored and acted on disability discriminatory animus, one would expect that any adverse employment action would have been visited on the alleged disabled person. But on this record, the overwhelming evidence establishes that the employer believed Ms. Bridges to be someone who harassed Ms. McRoy (and intimidated others); she was not a protector.

There is no evidence upon which a jury could conclude that any of the three situations that fit the associational provision of the ADAAA existed. *See Larimer,* 370 F.3d at 700. The "expense" situation does not fit, and Ms. Bridges does not

---

[6] *E.g., Larimer,* 370 F.3d 698 (7th Cir. 2005) (children); *Magnus,* 688 F.3d 331 (7th Cir. 2012) (child); *Dewitt,* 517 F.3d 944 (7th Cir. 2008) (spouse); *Erdman v. Nationwide Ins. Co.,* 582 F.3d 500 (3rd Cir. 2009) (child); *Leavitt v. SW & B Const. Co.,* 766 F. Supp. 2d 263 (D. Maine 2011) (spouse); *Pollere v. USIG Pennsylvania, Inc.,* 136 F. Supp. 3d 680 (E.D. Pa. 2015) (spouse); *Haire v. BIOS Corp.,* 2009 WL 484207 (N.D. Okla. Feb. 26, 2009) (employee worked as a "companion" to persons with development disabilities); *Tyson v. Access Services,* 158 F. Supp. 3d 309 (E.D. Pa. 2016) (employee's job was to arrange services for disabled clients, with whom she claimed an "association"); *Valenti v. Massapequa Union Free School Dist.,* 2006 WL 2570871 (E.D.N.Y. Sept. 5, 2006) (employee was special education teacher and claimed "association" with the students for whom he advocated services); *Colon v. San Juan Marriott Resort and Stellaris Casino,* 600 F. Supp. 2d 295 (D. Puerto Rico 2008) (spouse); *Barker v. International Paper Co.,* 993 F. Supp. 10 (D. Maine 1998) (spouse); *Oliveras-Sifre v. Puerto Rico Dep't of Health,* 214 F.3d 23 (1st Cir. 2000) (employee was advocate for AIDS patients).

argue it does. The "disability by association" situation does not fit, and Ms. Bridges does not argue it does. And the "distraction" situation does not fit either. While Ms. Bridges may have made herself distracted because she believed Ms. McCoy had an odor problem, Ms. Bridges was not responsible for any care or tending to Ms. McCoy.

At bottom, there is simply nothing in the record that would allow a jury to conclude that Ms. Bridges's employment was terminated because the City/Superior Court harbored some discriminatory animus against disabled persons that it visited on Ms. Bridges. The defendant is therefore entitled to summary judgment.

## Conclusion

For the foregoing reasons, the defendant's motion for summary judgment (Dkt. 36) is GRANTED. Judgment will be entered by a separate order.

So ORDERED.

Dated: July 11, 2019

*Debra McVicker Lynch*
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record by email through the court's ECF system